1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
ICE CREAM DISTRIBUTORS OF EVANSVILLE,          No. 09-5815 CW
9   LLC,
                                               ORDER GRANTING
10            Plaintiff,                        DREYER'S
                                               ENTITIES' MOTION
11       v.                                     TO DISMISS
                                               (Docket No. 29)
12   DREYER'S GRAND ICE CREAM, INC.;
    DREYER'S GRAND ICE CREAM HOLDINGS,
13   INC.; EDY'S GRAND ICE CREAM, INC.;
    and RANDY STATHERS,
14
             Defendants.
15   _____/

16

17      Plaintiff Ice Cream Distributors of Evansville, LLC (ICD)

18  alleges that Defendants Dreyer's Grand Ice Cream, Inc.; Dreyer's

19  Grand Ice Cream Holdings, Inc.; Edy's Grand Ice Cream, Inc.

20  (collectively, Dreyer's); and Defendant Randy Stathers violated the

21  Racketeer Influenced and Corrupt Organizations (RICO) Act, 18

22  U.S.C. §§ 1961-68; federal and state antitrust laws; and

23  California's Unfair Competition Law (UCL), Cal. Bus & Prof. Code

24  §§ 17200, et seq.  Dreyer's moves to dismiss ICD's complaint for

25  failure to state a claim.  Mr. Stathers has not answered ICD's

26  complaint and does not join in the motion.[1]  ICD opposes the motion

27  _____

28       [1] Pursuant to stipulation, the Court extended the time for Mr.
    Stathers to answer ICD's complaint.  (Docket No. 33.)

**United States District Court**
For the Northern District of California

in part.  The motion was heard on April 29, 2010.  Having considered oral argument and the papers submitted by the parties, the Court GRANTS Dreyer's motion.

BACKGROUND

Unless otherwise indicated, the following allegations are contained in ICD's complaint.

ICD is a limited liability corporation registered in Kentucky. Dreyer's Grand Ice Cream, Inc. and Dreyer's Grand Ice Cream Holdings, Inc. are Delaware corporations with a principal place of business in California.  At all times relevant to this action, Edy's Grand Ice Cream, Inc., a California corporation, was a wholly-owned subsidiary of Dreyer's Grand Ice Cream, Inc., which itself was a wholly-owned subsidiary of Dreyer's Grand Ice Cream Holdings, Inc.  Dreyer's Entities' Request for Judicial Notice (RJN), Exs. 2-3.[2]

ICD sold and distributed ice cream products to grocery and convenience stores in Illinois, Indiana and Kentucky.

In or around July, 2004, Dreyer's employees conspired "to wrongfully acquire ICD's accounts through the use of false statements, unfair business practices, and hiring away key employees from ICD to steal ICD's account information."  First Am. Compl. (1AC) ¶¶ 22 and 25.  To further this scheme, these employees communicated by telephone and email.

---

[2] Dreyer's requests judicial notice of filings with the Securities and Exchange Commission and with the Delaware Secretary of State.  Because the facts contained in these filings are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," the Court grants Dreyer's request.  Fed. R. Evid. 201.

2

United States District Court
For the Northern District of California

In or around December, 2004, Dreyer's contacted ICD about entering into a "Standard Distributorship Agreement - Grocery Channel" (Grocery Agreement), which would govern distribution of Dreyer's products to grocery stores, and a "Standard Distributorship Agreement - New Channel" (New Channel Agreement), which would provide terms for distribution to convenience stores. 1AC ¶¶ 15 and 16. Dreyer's conditioned the execution of a Grocery Agreement on ICD agreeing to a New Channel Agreement that would prohibit ICD from selling or distributing ice cream products of Dreyer's competitors, including Unilever, to convenience stores. ICD was hesitant to enter into such an exclusive distribution agreement without compensation for "the risk of narrowing its product selection . . . ." Compl. ¶ 18.

On or around December 12, 2005, Dreyer's notified ICD that it would no longer sell its products to ICD for distribution in grocery stores because ICD refused to enter into an exclusive distribution agreement. As a result, ICD could no longer serve its grocery store accounts, causing a loss of "over half of its business." 1AC ¶ 34.

Also, beginning in December, 2005, Dreyer's made "false and slanderous statements" about ICD. 1AC ¶ 52. These statements caused many convenience stores and regional ice cream distributors to terminate their relationships with ICD. Most of these statements were made between December, 2005 and March, 2006; three were communicated in early 2007. ICD was informed by "Walgreens-Louisville" that, during the same period, "Dreyer's was taking similar actions against various other local distributors around the

3

**United States District Court**
For the Northern District of California

1  country."  1AC ¶ 71.

2      At around the same time, Dreyer's recruited and hired

3  Defendant Stathers, who was an ICD branch manager, and Buddy Stone,

4  a driver for ICD.  Stathers and Stone had substantial knowledge of

5  ICD's business practices.  Both agreed to misappropriate, on behalf

6  of Dreyer's, ICD's confidential information.

7      ICD contends that Defendants engaged in racketeering activity

8  and imposed unreasonable restraints of trade.  ICD brings four

9  claims under the RICO Act, asserting that Defendants violated and

10  conspired to violate 18 U.S.C. §§ 1962(a) and 1962(c).  It also

11  asserts claims for violations of § 1 of the Sherman Act and

12  California's Cartwright Act and UCL.  ICD maintains that Defendants

13  caused the "total collapse" of its business, leading it to cease

14  operations in or around September, 2007.  1AC ¶ 73.

15                          LEGAL STANDARD

16      A complaint must contain a "short and plain statement of the

17  claim showing that the pleader is entitled to relief."  Fed. R.

18  Civ. P. 8(a).  Dismissal under Rule 12(b)(6) for failure to state a

19  claim is appropriate only when the complaint does not give the

20  defendant fair notice of a legally cognizable claim and the grounds

21  on which it rests.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

22  (2007).  In considering whether the complaint is sufficient to

23  state a claim, the court will take all material allegations as true

24  and construe them in the light most favorable to the plaintiff.  NL

25  Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

26  However, this principle is inapplicable to legal conclusions;

27  "threadbare recitals of the elements of a cause of action,

28                               4

supported by mere conclusory statements," are not taken as true.
Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009)
(citing Twombly, 550 U.S. at 555).

When granting a motion to dismiss, the court is generally
required to grant the plaintiff leave to amend, even if no request
to amend the pleading was made, unless amendment would be futile.
Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911
F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment
would be futile, the court examines whether the complaint could be
amended to cure the defect requiring dismissal "without
contradicting any of the allegations of [the] original complaint."
Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).
Leave to amend should be liberally granted, but an amended
complaint cannot allege facts inconsistent with the challenged
pleading.  Id. at 296-97.

DISCUSSION

I.   RICO Claims

To state a claim for relief in a private RICO action, ICD must
allege four essential elements: (1) a pattern of racketeering
activity, (2) the existence of an enterprise engaged in or
affecting interstate or foreign commerce, (3) a nexus between the
pattern of racketeering activity and the enterprise and (4) an
injury to its business or property by reason of the above.  Sedima
S.P.R.L. v. Imrex Company, Inc. et al., 473 U.S. 479 (1985).
The racketeering activities upon which ICD relies are the federal
offenses of mail fraud and wire fraud.  "A wire fraud violation
consists of (1) the formation of a scheme or artifice to defraud;

(2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." <u>Odom v. Microsoft Corp.</u>, 486 F.3d 541, 554 (9th Cir. 2008) (internal quotation marks omitted); 18 U.S.C. § 1343.  The elements of mail fraud differ only in that they involve the use of the United States mails rather than wires.  <u>See</u> 18 U.S.C. § 1341.  All such allegations must be plead with particularity.  <u>Moore v. Kayport Package Express, Inc.</u>, 885 F.2d 531, 541 (9th Cir. 1989).

Dreyer's argues that ICD's four RICO claims fail because ICD does not allege a pattern of racketeering activity and proximate causation.  Even if these threshold elements were plead, Dreyer's contends that ICD's claim under 18 U.S.C. § 1962(c) fails for the independent reason that ICD did not plead RICO persons distinct from the RICO enterprise.

ICD does not oppose dismissal of its claim under 18 U.S.C. § 1962(a), acknowledging that it has not sufficiently plead injury resulting from Dreyer's investment of racketeering funds.  Opp'n at 8.  Accordingly, for this reason and those discussed below, this claim is dismissed with leave to amend.  Because ICD's § 1962(a) claim serves as a predicate for one of its claims under 18 U.S.C. § 1962(d), which proscribes conspiracies to commit RICO violations, the Court likewise dismisses that claim with leave to amend.

A.   Pattern of Racketeering Activity

"A 'pattern' of racketeering activity . . . requires proof that the racketeering predicates are related and 'that they amount to or pose a threat of continued criminal activity.'"  <u>Turner v.</u>

United States District Court
For the Northern District of California

<u>Cook</u>, 362 F.3d 1219, 1229 (9th Cir. 2004) (quoting <u>H.J. Inc. v. Nw.</u>
<u>Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989)).  A pattern can be shown
through either closed- or open-ended continuity.  <u>Turner</u>, 362 F.3d
at 1229.  To allege closed-ended continuity, a plaintiff must aver
a "series of related predicates" that extends "over a substantial
period of time" and threatens future criminal conduct.  <u>Id.</u> (citing
<u>Howard v. Am. Online, Inc.</u>, 208 F.3d 741, 750 (9th Cir. 2000))
(editing marks omitted).  To plead open-ended continuity, a
plaintiff "must charge a form of predicate misconduct that 'by its
nature projects into the future with a threat of repetition.'"
<u>Turner</u>, 362 F.3d at 1229 (quoting <u>Religious Tech. Ctr. v.</u>
<u>Wollersheim</u>, 971 F.2d 364, 366 (9th Cir. 1992)).

ICD contends that it pleads a pattern through closed-ended
continuity, referring to its allegations of misconduct spanning
from July, 2004 through 2007.  In particular, ICD identifies eleven
statements between December, 2005 and March, 2006.  However, with
regard to nine of them, ICD fails to plead the mode through which
Dreyer's communicated.[3]  <u>See</u> 1AC ¶¶ 53, 56-61, 66-67.  Therefore,
as plead, these nine communications do not constitute mail or wire
fraud.  ICD does allege that Dreyer's communicated two allegedly
false statements by wire, 1AC ¶¶ 55 and 65; however, two instances
of alleged wire fraud do not establish closed-ended continuity.

Assuming ICD plead all eleven communications with sufficient
specificity, mail and wire fraud over a four-month period would not

---

[3] ICD makes a broad allegation that Dreyer's communicated by
telephone, U.S. mail and the Internet to further its alleged
fraudulent scheme.  1AC ¶ 76.  However, this does not satisfy the
specificity required for RICO claims.

**United States District Court**
For the Northern District of California

constitute "a 'series of related predicates extending over a substantial period of time.'" Turner, 362 F.3d at 1231. To expand the timeframe, ICD refers to conduct that occurred in July, 2004. Then, Dreyer's employees allegedly conspired "to wrongfully acquire ICD's accounts through the use of false statements, unfair business practices, and hiring away key employees from ICD to steal ICD's account information." 1AC ¶ 22. ICD does not cite authority providing that the goal of this conduct -- acquiring ICD's accounts -- constitutes racketeering activity under 18 U.S.C. § 1961(1). And although ICD alleges that Dreyer's used "false statements" to achieve this end, it fails to plead these statements with specificity. ICD has not identified the "who, what, where, or why" of these alleged false statements or "set forth what is false or misleading about" them and why they are false. Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation and quotation marks omitted). Thus, as plead, the July, 2004 conduct of which ICD complains cannot serve as a predicate for its RICO claim.[4]

ICD also cites three statements allegedly made in 2007. However, these three statements, along with the eleven others made between December, 2005 and March, 2006 do not constitute conduct over a substantial period of time, which is necessary to support a RICO claim. See Turner, 362 F.3d at 1231 (concluding that ninety-four communications over a two-month period, along with three from

---

[4] Furthermore, the alleged enterprise did not exist at that time. Although ICD avers that Mr. Stathers was part of the enterprise, it alleges that he became associated with Dreyer's in January, 2006.

United States District Court
For the Northern District of California

the prior year, did not suffice as a pattern of racketeering activity).  Furthermore, ICD fails to plead that at least two of these statements were false.  1AC ¶¶ 62 and 64.[5]  Accordingly, ICD has not alleged a pattern through closed-ended continuity.

ICD likewise fails to plead a pattern through open-ended continuity.  ICD contends that the statements between December, 2005 and March, 2006 demonstrated a threat of future misconduct.  However, ICD has not plead these acts with the specificity required to suggest the communications constituted wire and mail fraud.  And even if it had, ICD has not alleged facts to suggest a threat of future misconduct.  ICD avers that Dreyer's identified Unilever as its "number one nemesis" and that it learned through Walgreens that Dreyer's engaged "in similar actions against various other local distributors."  1AC ¶ 71.  Citing <u>Ticor Title Insurance v. Florida</u>, ICD maintains that these allegations suggest a "regular way of conducting business" sufficient to show a threat of future misconduct.  937 F.2d 447, 450 (9th Cir. 1991).  However, Dreyer's statement about its competitor, on its own, does not suggest that it will engage in future racketeering activity.  And ICD fails to allege facts to support its claim that Dreyer's harmed other regional distributors through wire and mail fraud.  If it intends to allege such fraudulent conduct, ICD must allege facts with specificity.  In its current complaint, ICD does not do so.  Accordingly, it does not allege a pattern through open-ended

_____

[5] ICD does not appear to consider these statements false and misleading.  As discussed in greater detail below, ICD argues that only one of the statements made in 2007 was false and misleading.  <u>See</u> Opp'n at 13.

continuity.

Because ICD fails to plead a pattern of racketeering conduct, the Court dismisses all of its RICO claims with leave to amend.

B.   Proximate Causation

To show an injury under RICO, a plaintiff must show a concrete financial loss, not mere injury to a valuable intangible property interest.  Oscar v. Univ. Students Coop. Ass'n, 965 F.2d 783, 785 (9th Cir. 1992); Fireman's Fund Ins. Co. v. Stites, 258 F.3d 1016, 1021 (9th Cir. 2001).  The Supreme Court has stated that there must be "some direct relation between the injury asserted and the injurious conduct alleged.  Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover."  Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 268-69 (1992).  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to plaintiff's injuries."  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 460-61 (2006).

ICD adequately alleges that Defendants' acts proximately caused its injury.  Although ICD may be seeking damages in excess of the harm Defendants actually caused, this would not defeat causation.

C.   Claim under 18 U.S.C. § 1962(c)

Under 18 U.S.C. § 1962(c),

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

10

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity or collection
> of unlawful debt.

To establish liability under this section, a plaintiff must allege "(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005) (quoting Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001)). In other words, a RICO "enterprise"[6] must constitute an entity distinct from the RICO "person." Living Designs, 431 F.3d at 361; River City Markets, Inc. v. Fleming Foods W., Inc., 960 F.2d 1458, 1461 (9th Cir. 1992) (stating that "a single individual or entity cannot be both the RICO enterprise and an individual RICO defendant"); see also Walter v. Drayson, 538 F.3d 1244, 1247 (9th Cir. 2008).

ICD pleads that the three Dreyer's entities and Mr. Stathers are RICO "persons" that also comprise the RICO "enterprise." This does not satisfy the distinctiveness requirement. At the time the alleged activity took place, Mr. Stathers was a Dreyer's employee, and Edy's was a wholly-owned subsidiary of Dreyer's Grand Ice Cream, Inc.[7] An "enterprise" comprised of a corporation, a wholly-owned subsidiary and an employee of that corporate family is not a being sufficiently distinct from these entities as "persons." See

---

[6] An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

[7] Notably, ICD does not plead how Dreyer's Grand Ice Cream Holdings, Inc. participated in the enterprise.

11

United States District Court
For the Northern District of California

<u>Living Designs</u>, 431 F.3d at 361-62; <u>Fogie v. THORN Americas, Inc.</u>, 190 F.3d 889, 896 (8th Cir. 1999) (concluding that a parent and subsidiary are not sufficiently distinct for the purposes of § 1962(c)); <u>Greenstein v. Peters</u>, 2009 WL 722067, at *2 (C.D. Cal.).  As plead, the RICO "enterprise" is indistinguishable from the RICO "persons."

ICD cites <u>River City Markets, Inc. v. Fleming Foods West, Inc.</u>, in which the Ninth Circuit stated that "a plaintiff is free to name all members of an association-in-fact enterprise as individual defendants."  960 F.2d 1458, 1462 (9th Cir. 1992) (citations omitted).  However, <u>River City</u> is inapposite because it involved an enterprise comprised of two separate corporate families that "associated together in a business relationship akin to a joint venture . . . ."  <u>Id.</u> at 1461.  Thus, the combination of the individual defendants in the enterprise created a new entity because they had not been previously related.  As the court explained, "Logically, one can associate with a group of which he is a member, with the member and the group remaining distinct entities."  <u>Id.</u>  The same does not apply here.  Unlike in <u>River City</u>, the three Dreyer's Defendants are all part of the same corporate family, of which Mr. Strathers is an employee.  The combination of Defendants as an enterprise does not create a sufficiently distinct being.  Thus, ICD's reliance on <u>River City</u> is misplaced.

Accordingly, even if ICD adequately plead a pattern of racketeering activity, its § 1962(c) claim would nevertheless fail because it does not plead RICO persons that are sufficiently

12

distinct from the alleged RICO enterprise.  For this additional
reason, the Court dismisses this claim with leave to amend.
Because ICD's § 1962(c) claim serves as a predicate for one of its
claims under 18 U.S.C. § 1962(d), that claim is likewise dismissed
with leave to amend.

II.   Federal and State Antitrust Claims

     A.   Sherman Act Claim

          To state a claim under § 1 of the Sherman Act, a plaintiff
"must demonstrate: '(1) that there was a contract, combination, or
conspiracy; (2) that the agreement unreasonably restrained trade
under either a per se rule of illegality or a rule of reason
analysis; and (3) that the restraint affected interstate
commerce.'"  Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th
Cir. 2001) (quoting Hairston v. Pac. 10 Conference, 101 F.3d 1315,
1318 (9th Cir. 1996)).

          Dreyer's argues that ICD's antitrust claims must be dismissed
because ICD fails to allege an antitrust conspiracy and an injury
to competition.  Dreyer's also contends that ICD does not plead an
unlawful tying arrangement.

              1.   Existence of a Contract, Combination or Conspiracy

          ICD alleges that Defendants entered into an agreement to
demand "that ICD cease distribution and sale of all of Dreyer's
competitors' products, namely Unilever products, and . . . enter
into an agreement whereby ICD would distribute Dreyer's products
exclusively."  1AC ¶ 122.  However, as plead, only Edy's and
Dreyer's Grand Ice Cream, Inc. and its employees were responsible
for this alleged anti-competitive conduct.  Coordinated acts among

13

United States District Court
For the Northern District of California

a corporation, its wholly-owned subsidiary and its employees do not establish the type of conspiracy to which § 1 is directed. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777 (1984) (concluding that a corporation "and its wholly owned subsidiary . . . are incapable of conspiring with each other for purposes of § 1 of the Sherman Act"); see also Jack Russell Terrier Network for N. Cal. v. Am. Kennel Club, Inc., 407 F.3d 1027, 1034 (9th Cir. 2005) ("The crucial question is whether the entities alleged to have conspired maintain an 'economic unity,' and whether the entities were either actual or potential competitors."). These actors are not "pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." Copperweld, 467 U.S. at 769. Section 1 applies only to "restraints effected by a contract, combination, or conspiracy" and therefore "leaves untouched a single firm's anticompetitive conduct . . . ." Id. at 775.

To save its claim, ICD argues that, when "Dreyer's was attempting to force ICD into unlawful exclusivity and tying arrangements," Mr. Stathers was an ICD employee. Opp'n at 10. Although this may be true, it is irrelevant. To allege a conspiracy involving Mr. Stathers, ICD must plead that, while working for ICD, he agreed with Dreyer's to impose an unreasonable restraint of trade.[8] Furthermore, ICD does not allege that Mr.

---

[8] In its complaint, ICD identifies Mr. Stathers as part of a group of persons that "also conspired to force ICD into improper tying arrangements and exclusivity arrangements." 1AC ¶ 23. However, ICD does not plead facts to suggest that Mr. Stathers associated with Dreyer's prior to his employment in January, 2006. Thus, as alleged, Mr. Stathers did not "conspire" with Dreyer's

United States District Court
For the Northern District of California

Stathers was an actual or potential competitor of ICD.  Thus, Mr. Stathers does not appear legally capable of participating in an antitrust conspiracy.

ICD does not allege a contract, combination or conspiracy to support its § 1 claim.  Accordingly, the Court dismisses ICD's Sherman Act claim with leave to amend.

2.   Injury to Competition

"Indispensable to any section 1 claim is an allegation that competition has been injured rather than merely competitors." Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 734 (9th Cir. 1987) (emphasis in original); see also In re Webkinz Antitrust Litig., 2010 WL 597990, at *5 (N.D. Cal.).  "'The intent proscribed by the antitrust laws lies in the purpose to harm competition in the relevant market, not to harm a particular competitor.'" Rutman Wine, 829 F.2d at 735 (quoting A.H. Cox & Co. v. Star Machinery, 653 F.2d 1302, 1307 (9th Cir. 1981)).  "In order successfully to allege injury to competition, a section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably.  Rather, a claimant must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail."  Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 507-08 (9th Cir. 1989) (citing Rutman Wine, 829 F.2d at 736).

ICD pleads that the alleged demands by Dreyer's that it enter into exclusivity agreements had "the probable effect of foreclosing

_____

until he was a Dreyer's employee.

15

United States District Court
For the Northern District of California

competition in a substantial share of the line of commerce."  1AC
¶ 122.  Although not clearly stated, it appears that ICD complains
that Dreyer's harmed competition in the market for novelty ice
cream products sold in convenience stores.  See 1AC ¶ 123 (pleading
that Dreyer's "imposed an illegal tying arrangement on ICD by using
its market power in grocery store accounts to demand that ICD
purchase Defendants' novelty ice cream products, a distinct market
in which Defendants Dreyer's and Edy's did not have market power");
Opp'n at 11 ("In the case at hand, the purpose of Dreyer's
exclusivity requests were centered on its desire to damage
Unilever's business and pick up market share.").  However, ICD
fails to plead any facts to suggest that Dreyer's reduced
competition in this market or negatively impacted its competitors,
such as Unilever.  See Rebel Oil Co., Inc. v. Atl. Richfield Co.,
51 F.3d 1421, 1433 (9th Cir. 1995).  And even if ICD made such
allegations, it must also plead facts concerning how the conduct
harmed consumers.  Id. ("Of course, conduct that eliminates rivals
reduces competition.  But reduction of competition does not invoke
the Sherman Act until it harms consumer welfare.").

Instead of pleading facts addressing injury to the market, ICD
alleges harm to its business.[9]  This injury is not sufficient to
sustain a claim under the Sherman Act.  Accordingly, even if ICD

[9] ICD cites Klor's v. Broadway-Hale Stores, 359 U.S. 207
(1959), which does not support its position.  Klor's involved
allegations of a group boycott, whereby various manufacturers,
distributors and a retailer conspired "either not to sell to Klor's
or to sell to it only at discriminatory prices and highly
unfavorable terms."  359 U.S. at 209.  Here, ICD does not plead
that Dreyer's and the regional ice cream distributors conspired to
engage in a group boycott against ICD.

plead an antitrust conspiracy, its Sherman Act claim would nevertheless fail because it failed to allege an injury to competition.

### 3.   Illegal Tying Arrangement

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 912 (9th Cir. 2008) (citation omitted). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." Id. "For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." Id. at 913 (citation omitted).

ICD seems to plead that Dreyer's tied the sale of its multiple-serving ice cream product packages, generally marketed in grocery stores, to the purchase of its individual "novelty ice cream products," which are typically carried by convenience stories. 1AC ¶ 123; Opp'n at 12. ICD suggests that Dreyer's did so because, although it had a presence in the grocery store distribution channel, it lacked a similar foothold in the convenience store channel.

ICD tying theory fails because, at the least, it has failed to

17

**United States District Court**
For the Northern District of California

allege that this purported tying arrangement impacted a "not insubstantial volume of commerce" in the novelty ice cream product market.   ICD argues that its allegations that "it lost over six hundred convenience stores" supports its claim.   ICD misapprehends the nature of this element.   Tying arrangements are prohibited on the theory that they cause "reduced competition in the market for the tied product." Rick-Mik Enters., Inc. v. Equilon Enters. LLC, 532 F.3d 963, 971 (9th Cir. 2008) (citing Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984)).   Thus, as above, ICD's allegation that it was harmed by the alleged tying conduct does not speak to whether competition in the convenience store product market was reduced.

Accordingly, like its allegations of an antitrust conspiracy, ICD's theory of liability based on tying fails.   In any amended complaint, ICD must make factual allegations, if it can truthfully do so, that Dreyer's conditioned its sale of multiple-serving ice cream product packages on ICD's purchase of its novelty ice cream products, that Dreyer's had sufficient market power in the multiple-serving ice cream product market to coerce its customers and that this tying arrangement affected a "not insubstantial amount of commerce," through a reduction in competition, in the novelty ice cream market.

    B.   Cartwright Act Claim

The pleading requirements under the Sherman and Cartwright Acts are the same.   County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001).   Because ICD does not state a Sherman Act claim, its Cartwright Act claim likewise fails and is

18

1    dismissed with leave to amend.

2    III. UCL Claim

3        California's Unfair Competition Law (UCL) prohibits any

4    "unlawful, unfair or fraudulent business act or practice."  Cal.

5    Bus. & Prof. Code § 17200.  The UCL incorporates other laws and

6    treats violations of those laws as unlawful business practices

7    independently actionable under state law.  <u>Chabner v. United Omaha</u>

8    <u>Life Ins. Co.</u>, 225 F.3d 1042, 1048 (9th Cir. 2000).  Violation of

9    almost any federal, state or local law may serve as the basis for a

10   UCL claim.  <u>Saunders v. Superior Court</u>, 27 Cal. App. 4th 832, 838-

11   39 (1994).  In addition, a business practice may be "unfair or

12   fraudulent in violation of the UCL even if the practice does not

13   violate any law."  <u>Olszewski v. Scripps Health</u>, 30 Cal. 4th 798,

14   827 (2003).

15       ICD pleads under the unlawful prong of the UCL,[10] alleging that

16   Dreyer's violated the RICO Act, the Sherman Act, the California

17   Uniform Trade Secrets Act (CUTSA), the Cartwright Act and

18   California Business & Professions Code section 17500, and

19   interfered with its economic relations.

20

21       [10] In its complaint, ICD states that the alleged violations of
     these statutes constituted "unfair" business practices.  1AC ¶ 112.
22   However, because ICD states in its opposition that its UCL claim is
     based on "violations of . . . 'borrowed' laws," the Court
23   understands ICD to plead the unlawful prong of the UCL.  Opp'n at
     15.  Pleading the "unfair" prong of the UCL requires a plaintiff to
24   plead "conduct that threatens an incipient violation of an
     antitrust law, or violates the policy or spirit of one of those
25   laws because its effects are comparable to or the same as a
     violation of the law, or otherwise significantly threatens or harms
26   competition."  <u>Cel-Tech Commun's v. L.A. Cellular Telephone Co.</u>, 20
     Cal. 4th 163, 187 (1999).  As noted above, ICD fails to allege harm
27   to competition.

28                                    19

United States District Court
For the Northern District of California

1    Because it fails to state claims for violations of the RICO

2  Act and state and federal antitrust laws, ICD's UCL claim must be

3  dismissed insofar as it is based on those claims.  And although ICD

4  also premises its UCL claim on violations of the CUTSA and

5  intentional interference with economic relations,[11] the claim is

6  nevertheless dismissed in its entirety for the reasons stated

7  below.

8    A.   Statute of Limitations

9    "The UCL has a four-year statute of limitations, which applies

10  even if the borrowed statute has a shorter limitations statute."

11  Blanks v. Shaw, 171 Cal. App. 4th 336, 364 (2009) (citing Cal. Bus.

12  & Prof. Code § 17208); see also Cortez v. Purolator Air Filtration

13  Prods. Co., 23 Cal. 4th 163, 179 (2000) ("Any action on any UCL

14  cause of action is subject to the four-year limitations period

15  created by that section.") (emphasis in original).  The "general

16  rule is that a UCL cause of action borrows the substantive portion

17  of the borrowed statute to prove the 'unlawful' prong of that

18  statute, but not the limitations procedural part of the borrowed

19  statute."  Blanks, 171 Cal. App. 4th at 364.

20    Because ICD initiated this action on December 11, 2009, it may

21  maintain its UCL claim based on conduct that occurred on or after

22

23

24  _____

25    [11] Dreyer's maintains that ICD fails to allege facts supporting
such unlawful conduct by each Dreyer's entity.  However, ICD pleads
26  that the Dreyer's entities committed these unlawful acts through
their employees.  Assuming they are agents of Dreyer's, the
27  employees' actions can be imputed on to their employer.

28                                20

December 11, 2005.[12]

B.   Application of UCL to Conduct Outside of California

California's Unfair Competition Law "does not apply to actions occurring outside of California that injure non-residents." Standfacts Credit Servs., Inc. v. Experian Information Solutions, Inc., 405 F. Supp. 2d 1141, 1148 (C.D. Cal. 2005) (citing Norwest Mortgage, Inc. v. Superior Court, 72 Cal. App. 4th 214, 226 (1999)).  Nonetheless, a claim under section 17200 may be asserted by a non-resident plaintiff if the challenged conduct occurred in or emanated from California.  Wershba v. Apple Computer, Inc., 91 Cal. App 4th 224, 241-42 (2001); Norwest Mortgage, 72 Cal. App. 4th at 222.

The conduct of which ICD complains largely took place outside of California and, as a result, cannot provide a basis for its UCL claim.  Accordingly, the claim is dismissed with leave to amend to allege conduct that occurred in or emanated from California.

C.   Restitution

Under the UCL, private plaintiffs may only seek injunctive or restitutionary relief.  See Cal. Bus. & Prof. Code § 17203; see also Madrid v. Perot Sys. Corp., 130 Cal. App. 4th 440, 452-53 (2005).  In "the context of the UCL, 'restitution' is limited to the return of property or funds in which the plaintiff has an ownership interest (or is claiming through someone with an ownership interest)."  Madrid, 130 Cal. App. 4th at 453 (citation

---

[12] The Court understands ICD to bring its false advertising claim under the UCL.  Thus, it need not address Dreyer's arguments concerning the application of California Code of Civil Procedure section 338 to this case.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

omitted).  Dreyer's maintains that ICD's UCL claim must be dismissed because ICD seeks damages, not restitution.

In its opposition, ICD argues that it is "entitled to restitution of money it paid to Defendants for ice cream products, money spent for equipment to distribute said products, and money spent for the purchase of ICD." Opp'n at 15.  However, ICD did not plead this in its complaint.  Nor did ICD plead how restitution of these monies is connected to the alleged unlawful business practices of Dreyer's.[13]  Because ICD failed to plead the basis of its request for restitution, its UCL claim is dismissed with leave to amend.

CONCLUSION

For the foregoing reasons, the Court GRANTS Dreyer's motion to dismiss.  (Docket No. 29.)  The Court's holdings are summarized as follows:

1.   ICD's claims under the RICO Act are dismissed with leave to amend.  With respect to all of its RICO claims, ICD has failed to allege a pattern of racketeering activity. Concerning its claim under 18 U.S.C. § 1962(a), ICD has failed to allege injury resulting from Dreyer's investment of funds obtained through racketeering.  As for its claim under 18 U.S.C. § 1962(c), ICD has failed to allege a RICO enterprise distinct from the purported RICO persons.  Because its claims under §§ 1962(a) and

---

[13] In its complaint, ICD provides conclusory statements that its "remedy at law is inadequate" and that it requires "restitution and disgorgement of all unjust profits." 1AC ¶ 117; 1AC at 22.

United States District Court
For the Northern District of California

1    1962(c) fail, its claims under § 1962(d) for conspiracy

2    to commit violations under these sections likewise fail.

3    2.   ICD's claim under the Sherman Act is dismissed with leave

4    to amend.  ICD fails to allege a cognizable contract,

5    combination or conspiracy and an antitrust injury.  ICD

6    also does not plead a cognizable antitrust theory based

7    on an unlawful tying arrangement.  Because ICD fails to

8    state a Sherman Act claim, its Cartwright Act claim is

9    likewise dismissed.

10   3.   ICD's claim under the UCL is dismissed with leave to

11   amend.  The relevant statute of limitations bars the

12   action only to the extent that it rests on actions that

13   accrued before December 11, 2005.  However, ICD must

14   allege conduct that occurred in or emanated from

15   California and a basis for a restitutionary remedy.

16   ICD may file an amended complaint addressing the deficiencies

17   detailed above within fourteen days of the date of this Order.  If

18   ICD does so, Defendants may file a motion to dismiss three weeks

19   thereafter, with ICD's opposition due two weeks following and

20   Defendants' reply due one week after that.  The motion will be

21   decided on the papers.

22   IT IS SO ORDERED.

23

24   Dated: May 28, 2010

25                                        CLAUDIA WILKEN
                                          United States District Judge

26

27

28                        23