IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ICE CREAM DISTRIBUTORS OF EVANSVILLE, LLC,<br><br>            Plaintiff,<br><br>     v.<br><br>DREYER'S GRAND ICE CREAM, INC.; DREYER'S GRAND ICE CREAM HOLDINGS, INC.; EDY'S GRAND ICE CREAM, INC.; and RANDY STATHERS,<br><br>            Defendants.                    / | No. 09-5815 CW<br><br>ORDER GRANTING DREYER'S ENTITIES' MOTION TO DISMISS<br>(Docket No. 47) |

Plaintiff Ice Cream Distributors of Evansville, LLC (ICD) alleges that Defendants Dreyer's Grand Ice Cream, Inc.; Dreyer's Grand Ice Cream Holdings, Inc.; Edy's Grand Ice Cream, Inc. (collectively, Dreyer's); and Defendant Randy Stathers violated the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961-68; federal and state antitrust laws; and California's Unfair Competition Law (UCL), Cal. Bus & Prof. Code §§ 17200, et seq. Dreyer's moves to dismiss ICD's second amended complaint (2AC) for failure to state a claim. Stathers has not answered ICD's complaint and does not join in the motion.[1] ICD opposes the motion. The motion was taken under submission on the papers. Having considered the papers submitted by the parties, the Court GRANTS Dreyer's motion. ICD's action is dismissed with prejudice.

---

[1] Pursuant to stipulation, the Court extended the time for Stathers to answer ICD's complaint. (Docket No. 33.)

BACKGROUND

Unless otherwise indicated, the following allegations are contained in ICD's 2AC.

ICD is a limited liability corporation registered in Kentucky. Dreyer's Grand Ice Cream, Inc., and Dreyer's Grand Ice Cream Holdings, Inc., are Delaware corporations with a principal place of business in California. At all times relevant to this action, Edy's Grand Ice Cream, Inc., a California corporation, was a wholly-owned subsidiary of Dreyer's Grand Ice Cream, Inc., which itself was a wholly-owned subsidiary of Dreyer's Grand Ice Cream Holdings, Inc. Dreyer's Request for Judicial Notice (RJN) in Support of first Motion to Dismiss (Docket No. 30), Exs. 2-3.[2]

ICD sold and distributed ice cream products to grocery and convenience stores in Illinois, Indiana and Kentucky.

In or around July, 2004, Dreyer's employees conspired "to wrongfully acquire ICD's accounts through the use of false statements, unfair business practices, and hiring away key employees from ICD to steal ICD's account information." 2AC ¶¶ 22 and 25. To further this scheme, these employees communicated by telephone and email.

In or around December, 2004, Dreyer's contacted ICD about entering into a "Standard Distributorship Agreement - Grocery Channel" (Grocery Agreement), which would govern distribution of Dreyer's products to grocery stores, and a "Standard Distributorship Agreement - New Channel" (New Channel Agreement),

---

[2] The Court granted Dreyer's request for judicial notice of these documents in its Order of May 28, 2010. (Docket No. 41.)

2

which would provide terms for distribution to convenience stores. 2AC ¶¶ 15 and 16. Dreyer's conditioned the execution of a Grocery Agreement on ICD's acceptance of a New Channel Agreement that would prohibit ICD from selling or distributing the ice cream products of Dreyer's competitors, including Unilever, to convenience stores. ICD was hesitant to enter into such an exclusive distribution agreement without compensation for "the risk of narrowing its product selection . . . ." 2AC ¶ 18.

On or around December 12, 2005, Dreyer's notified ICD that it would no longer sell its products to ICD for distribution in grocery stores because ICD refused to enter into an exclusive distribution agreement. As a result, ICD could no longer serve its grocery store accounts, causing a loss of "over half of its business." 2AC ¶ 34.

Also, beginning in December, 2005, two Dreyer's employees in California directed other employees outside of California to make "false and slanderous statements" about ICD. 2AC ¶ 54. These statements caused many convenience stores and regional ice cream distributors to terminate their business relationships with ICD. Most of these statements were made between December, 2005 and March, 2006; three were communicated in early 2007. ICD was informed by "Walgreens-Louisville" that, during the same period, "Dreyer's was taking similar actions against various other local distributors around the country." 2AC ¶ 74. This conduct followed Dreyer's actions taken against "The Udder Guys," another ice cream distributor; in 2004, Dreyer's informed that distributor's customers that it was "out of business, bankrupt or being

3

replaced." 2AC ¶ 76.

In or around January, 2006, Dreyer's recruited and hired Stathers, an ICD branch manager, and Buddy Stone, a driver for ICD. Stathers and Stone had substantial knowledge of ICD's business practices. Both agreed to misappropriate, on behalf of Dreyer's, ICD's confidential information. In addition, prior to leaving ICD, Stathers conspired with a Dreyer's employee to replace ICD's "Good Humor novelty boxes" with "Nestle freezers." 2AC ¶ 53. At that time, Dreyer's had recently merged with Nestle. Through his action, "Stathers was setting himself and Dreyer's up to be direct competitors of ICD." 2AC ¶ 53.

ICD contends that Defendants engaged in racketeering activity and imposed unreasonable restraints of trade. ICD brings four claims under the RICO Act, asserting that Defendants violated and conspired to violate 18 U.S.C. §§ 1962(a) and 1962(c). It also asserts claims for violations of § 1 of the Sherman Act and California's Cartwright Act and UCL. ICD maintains that Defendants caused the "total collapse" of its business, leading it to cease operations in or around September, 2007. 2AC ¶ 78.

On May 28, 2010, the Court dismissed ICD's first amended complaint (1AC) with leave to amend. On June 11, 2010, ICD filed its 2AC, which Dreyer's subsequently moved to dismiss.

On June 18, 2010, ICD's counsel, Bracamontes & Vlasak, P.C., sought leave to withdraw as counsel, citing ICD's failure to pay fees owed. The Court granted Bracamontes & Vlasak's motion and provided that ICD's action would be dismissed for failure to prosecute if it did not obtain new counsel by August 16, 2010, the

4

date its opposition was due.  On August 16, Michael Bracamontes, of the Bracamontes & Vlasak firm, entered an appearance as the attorney-of-record for ICD and filed an opposition on its behalf.

## LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Dismissal under Rule 12(b)(6) for failure to state a claim is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

## DISCUSSION

ICD's 1AC and 2AC are largely identical.  Further, in opposition to Dreyer's motion, ICD repeats verbatim many of the arguments contained in its previous opposition brief.

ICD fails to correct the pleading deficiencies identified in the Court's Order of May 28, 2010.  Accordingly, its claims are dismissed with prejudice for the reasons stated in that Order and those stated below.

5

I.  RICO Claims

To state a claim for relief in a private RICO action, ICD must allege four essential elements: (1) a pattern of racketeering activity, (2) the existence of an enterprise engaged in or affecting interstate or foreign commerce, (3) a nexus between the pattern of racketeering activity and the enterprise and (4) an injury to its business or property by reason of the above. <u>Sedima S.P.R.L. v. Imrex Company, Inc. et al.</u>, 473 U.S. 479 (1985). The racketeering activities upon which ICD relies are the federal offenses of mail fraud and wire fraud. "A wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." <u>Odom v. Microsoft Corp.</u>, 486 F.3d 541, 554 (9th Cir. 2008) (internal quotation marks omitted); 18 U.S.C. § 1343.  The elements of mail fraud differ only in that they involve the use of the United States mails rather than wires. <u>See</u> 18 U.S.C. § 1341.  All allegations of mail and wire fraud must be plead with particularity. <u>Moore v. Kayport Package Express, Inc.</u>, 885 F.2d 531, 541 (9th Cir. 1989).

ICD's RICO claims, as plead in its previous complaint, were dismissed because ICD failed to allege (1) a cognizable pattern of racketeering activity; (2) injury resulting from Dreyer's investment of racketeering funds, an element of a § 1962(a) claim; and (3) RICO persons distinct from a RICO enterprise, which is required to state a § 1962(c) claim.  The current iteration of ICD's RICO claims fails for the same reasons.

6

A. Pattern of Racketeering Activity

"A 'pattern' of racketeering activity . . . requires proof that the racketeering predicates are related and 'that they amount to or pose a threat of continued criminal activity.'" Turner v. Cook, 362 F.3d 1219, 1229 (9th Cir. 2004) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)). A pattern can be shown through either closed- or open-ended continuity. Turner, 362 F.3d at 1229. To allege closed-ended continuity, a plaintiff must aver a "series of related predicates" that extends "over a substantial period of time" and threatens future criminal conduct. Id. (citing Howard v. Am. Online, Inc., 208 F.3d 741, 750 (9th Cir. 2000)) (editing marks omitted). To plead open-ended continuity, a plaintiff "must charge a form of predicate misconduct that 'by its nature projects into the future with a threat of repetition.'" Turner, 362 F.3d at 1229 (quoting Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 366 (9th Cir. 1992)).

In its prior order, the Court held that the allegations of Dreyer's misconduct were not sufficient to support a finding of closed- or open-ended continuity. ICD appears to have made only two minor amendments to its RICO allegations, neither of which change this result.

First, ICD now identifies the mode through which Dreyer's made eleven alleged false statements between December, 2005 and March, 2006. This change does not suggest that Dreyer's engaged in criminal activity over a substantial period of time or that such activity is likely to recur in the future. Thus, this amendment does not rehabilitate ICD's RICO claims.

7

Second, ICD now alleges that, in spring of 2004, Dreyer's made statements about another ice cream distributor to "get [it] out of the way." 2AC ¶ 76. However, ICD does not allege that these assertions were false and, as a result, they cannot support allegations of mail or wire fraud. Even if ICD plead that they were misrepresentations, it has not plead these statements with sufficient particularity, as required under Federal Rule of Civil Procedure 9(b). Further, assuming that the statements were falsehoods, they would not suggest that Dreyer's engaged in a series of fraudulent acts over a substantial period of time. In total, ICD complains of statements made in spring of 2004; during a four month period between December, 2005 and March, 2006; and in early 2007. This sporadic activity is not sufficient to support a finding of closed-ended continuity. Nor is it sufficient to support liability under a theory of open-ended continuity; the 2004 statements do not suggest that Dreyer's is likely to engage in criminal activity in the future.

ICD's allegations remain insufficient to plead a pattern of racketeering conduct. Consequently, for the reasons stated above and in the Court's previous order, ICD's RICO claims are dismissed.

B.  Claim under 18 U.S.C. § 1962(a)

A "'plaintiff seeking civil damages for a violation of section 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income.'" Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1149 (9th Cir. 2008) (quoting Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co., 981 F.2d 429, 437 (9th Cir. 1992)). In its opposition to

8

Dreyer's first motion to dismiss, ICD admitted that its complaint failed to plead such an injury and sought leave to amend its § 1962(a) claim. ICD makes no effort to correct this deficiency in its 2AC.

Accordingly, for this additional reason, ICD's claims for violation of § 1962(a) and conspiracy to violate § 1962(a) are dismissed.

C. Claim under 18 U.S.C. § 1962(c)

Under 18 U.S.C. § 1962(c),

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To establish liability under this section, a plaintiff must allege "(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005) (quoting Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001)). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A RICO "enterprise" must constitute an entity distinct from the RICO "person." Living Designs, 431 F.3d at 361; River City Markets, Inc. v. Fleming Foods W., Inc., 960 F.2d 1458, 1461 (9th Cir. 1992) (stating that "a single individual or entity cannot be both the RICO enterprise and an individual RICO defendant"); see also Walter v. Drayson, 538

9

1 F.3d 1244, 1247 (9th Cir. 2008).

2 The Court dismissed the previous iteration of ICD's § 1962(c) claim because the alleged RICO persons, defined to be the three Dreyer's entities and Stathers, were not distinct from the alleged RICO enterprise.  Specifically, the Court held that a § 1962(c) claim could not be based on a RICO enterprise comprised of a corporation, a wholly-owned subsidiary and an employee of that corporate family if these entities were also plead as the RICO persons.  See Living Designs, 431 F.3d at 361-62; Fogie v. THORN Americas, Inc., 190 F.3d 889, 896 (8th Cir. 1999) (concluding that a parent and subsidiary are not sufficiently distinct for the purposes of § 1962(c)); Greenstein v. Peters, 2009 WL 722067, at *2 (C.D. Cal.).

14 ICD ignored the Court's previous holding.  The 2AC contains the same allegations that the three Dreyer's entities and Stathers were the RICO persons and that they comprised the RICO enterprise.

17 Accordingly, for this additional reason, ICD's claims for violation of § 1962(c) and conspiracy to violate § 1962(c) are dismissed.

II. Federal and State Antitrust Claims

    A.   Sherman Act Claim

To state a claim under § 1 of the Sherman Act, a plaintiff "must demonstrate: '(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'"  Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th

10

Cir. 2001) (quoting Hairston v. Pac. 10 Conference, 101 F.3d 1315, 1318 (9th Cir. 1996)).

        1.    Existence of a Contract, Combination or Conspiracy

In its previous order, the Court dismissed ICD's § 1 claim because it was based on unilateral conduct. Specifically, the Court held that the conduct by the three Dreyer's entities and its employees could not give rise to antitrust liability because coordinated acts among a corporation, its wholly-owned subsidiaries and its employees do not establish the type of conspiracy to which § 1 is directed. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777 (1984) (concluding that a corporation "and its wholly owned subsidiary . . . are incapable of conspiring with each other for purposes of § 1 of the Sherman Act"); see also Jack Russell Terrier Network for N. Cal. v. Am. Kennel Club, Inc., 407 F.3d 1027, 1034 (9th Cir. 2005) ("The crucial question is whether the entities alleged to have conspired maintain an 'economic unity,' and whether the entities were either actual or potential competitors.").

The only relevant change to ICD's pleadings does not correct this defect. The 2AC includes new allegations that, while still working for ICD, Stathers conspired with a Dreyer's employee to replace ICD's displays of Unilever products with freezers containing Nestle products. Assuming that this was anti-competitive conduct, ICD fails to plead facts that suggest Stathers engaged in such a conspiracy as an actual or potential competitor in the novelty ice cream products market. Although ICD alleges that "Stathers was setting himself . . . up to be" a competitor,

11

2AC ¶ 53, its pleadings suggest that he did so on behalf of Dreyer's, not because he intended to compete. Indeed, there are no allegations to support an inference that Stathers, as an individual, had the capacity to engage in such competition.

ICD fails to allege a contract, combination or conspiracy in support of its § 1 claim. Accordingly, for the reasons stated herein and in the Court's Order of May 28, ICD's Sherman Act claim is dismissed.

### 2. Injury to Competition

"Indispensable to any section 1 claim is an allegation that <u>competition</u> has been injured rather than merely competitors." <u>Rutman Wine Co. v. E. & J. Gallo Winery</u>, 829 F.2d 729, 734 (9th Cir. 1987) (emphasis in original); see also <u>In re Webkinz Antitrust Litig.</u>, 2010 WL 597990, at *5 (N.D. Cal.). "'The intent proscribed by the antitrust laws lies in the purpose to harm competition in the relevant market, not to harm a particular competitor.'" <u>Rutman Wine</u>, 829 F.2d at 735 (quoting <u>A.H. Cox & Co. v. Star Machinery</u>, 653 F.2d 1302, 1307 (9th Cir. 1981)). "In order successfully to allege injury to competition, a section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably. Rather, a claimant must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail." <u>Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n</u>, 884 F.2d 504, 507-08 (9th Cir. 1989) (citing <u>Rutman Wine</u>, 829 F.2d at 736).

In its previous order, the Court dismissed ICD's § 1 claim for the additional reason that ICD failed to plead an injury to

12

competition. Specifically, ICD did not allege any facts to suggest that Dreyer's reduced competition in the novelty ice cream product market or negatively impacted its competitors, such as Unilever. See Rebel Oil Co., Inc. v. Atl. Richfield Co., 51 F.3d 1421, 1433 (9th Cir. 1995). Nor did ICD plead any facts concerning how the alleged anti-competitive conduct harmed consumers. Id. ("Of course, conduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare."). Instead, ICD alleged harm to its business, which is not sufficient to sustain a claim under the Sherman Act.

In an apparent attempt to correct these defects, ICD includes the following allegation in its 2AC,

> Both consumers and Defendants' competitors have been harmed by Defendants' anti-trust violations. The Retail Price of a ½ gallon of ice cream today (using April 2010) is $4.445, in the Kentucky area. Four years ago, in April 2006 -- after Edy's had taken back its grocery business, hired away key ICD employees and was telling C-Stores that "ICD is out of business" "ICD is bankrupt" "ICD has been discontinued, we are your new Distributor", the Retail Price of a ½ gallon of ice cream was $3.622. That equals an increase of 23% in just four years. Additionally, there are many areas in Kentucky where Edy's is now the sole distributor of ice cream, thus limiting the choices available to consumers, and increasing the cost to consumers.

2AC ¶ 131. These new allegations do not support ICD's claim that the Dreyer's entities' actions reduced competition in the novelty ice cream product market, injured its competitors or harmed consumers. ICD refers to half-gallons of ice cream, not novelty ice cream products, which it defines as "individually packaged ice cream bar[s]." 2AC ¶ 41. Thus, the purported increase in prices

13

is not probative of harm to competitors or consumers in the novelty ice cream product market. Further, ICD does not allege harm to competition, let alone outline the anti-competitive effects of the alleged misconduct, as required to state an antitrust claim.

Accordingly, for this additional reason, ICD's Sherman Act claim is dismissed.

### 3. Illegal Tying Arrangement

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 912 (9th Cir. 2008) (citation omitted). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." Id. "For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." Id. at 913 (citation omitted).

In its previous order, the Court rejected ICD's theory of antitrust liability based on a tying arrangement because ICD did not allege that Dreyer's conditioned its sale of multiple-serving ice cream product packages on ICD's purchase of its novelty ice cream products, that Dreyer's had sufficient market power in the multiple-serving ice cream product market to coerce its customers

14

and that this tying arrangement affected a "not insubstantial amount of commerce," through a reduction in competition, in the novelty ice cream market. ICD's 2AC does not include any new factual allegations to cure these deficiencies.

Accordingly, ICD's theory of antitrust liability based on tying is dismissed.

### 4. Group Boycott

ICD alleges that "Defendants' actions constitute a group boycott in restraint of trade." 2AC ¶ 132. However, as noted above, ICD offers no factual allegations to suggest that Dreyer's agreed with competitors to engage in an antitrust conspiracy, let alone one to engage in a group boycott. Accordingly, ICD's theory of antitrust liability based on a group boycott is dismissed.

B. Cartwright Act Claim

The pleading requirements under the Sherman and Cartwright Acts are the same. County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001). Because ICD does not state a Sherman Act claim, its Cartwright Act claim likewise fails and is dismissed.

III. UCL Claim

California's Unfair Competition Law (UCL) prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The UCL incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law. Chabner v. United Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000). Violation of almost any federal, state or local law may serve as the basis for a

15

UCL claim. <u>Saunders v. Superior Court</u>, 27 Cal. App. 4th 832, 838-39 (1994). In addition, a business practice may be "unfair or fraudulent in violation of the UCL even if the practice does not violate any law." <u>Olszewski v. Scripps Health</u>, 30 Cal. 4th 798, 827 (2003).

Under the UCL, private plaintiffs may only seek injunctive or restitutionary relief. <u>See</u> Cal. Bus. & Prof. Code § 17203; <u>see also</u> <u>Madrid v. Perot Sys. Corp.</u>, 130 Cal. App. 4th 440, 452-53 (2005). In "the context of the UCL, 'restitution' is limited to the return of property or funds in which the plaintiff has an ownership interest (or is claiming through someone with an ownership interest)." <u>Madrid</u>, 130 Cal. App. 4th at 453 (citation omitted).

ICD pleads under the unlawful prong of the UCL,[3] alleging that Dreyer's violated the RICO Act, the Sherman Act, the California Uniform Trade Secrets Act (CUTSA), the Cartwright Act and California Business & Professions Code section 17500, and interfered with its economic relations. The Court dismissed the previous iteration of ICD's UCL claim because the alleged

---

[3] In its 2AC, ICD states that the alleged violations of these statutes constituted "unfair" business practices. 2AC ¶ 117. However, because ICD states in its opposition that its UCL claim is based on "violations of . . . 'borrowed' laws," Opp'n at 7, the Court understands ICD to plead the unlawful prong of the UCL. Pleading the "unfair" prong of the UCL requires a plaintiff to plead "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." <u>Cel-Tech Commun's v. L.A. Cellular Telephone Co.</u>, 20 Cal. 4th 163, 187 (1999). As noted above, ICD fails to allege harm to competition.

16

1 misconduct largely took place outside of California and because
2 ICD's allegations suggested that it was seeking damages, not
3 restitution.  Also, the UCL claim was dismissed insofar as it was
4 based on violations of the RICO Act and state and federal antitrust
5 laws because ICD failed to state such violations.

6     The changes to ICD's pleading do not save its UCL claim.  To
7 address the limited geographical reach of the UCL, ICD amends its
8 allegations to state that Dreyer's employees outside of California
9 made fraudulent statements at the direction of two California-based
10 employees.  This does not alter the fact that the alleged
11 falsehoods were made outside of California and that the purported
12 injury befell a limited liability corporation based in Kentucky.
13 As the Court stated previously, the UCL "does not apply to actions
14 occurring outside of California that injure non-residents."
15 Standfacts Credit Servs., Inc. v. Experian Information Solutions,
16 Inc., 405 F. Supp. 2d 1141, 1148 (C.D. Cal. 2005) (citing Norwest
17 Mortg., Inc. v. Superior Court, 72 Cal. App. 4th 214, 226 (1999)).
18 Nor does ICD's bare allegation suggest that the fraudulent
19 statements were prepared in and emanated from California, which was
20 held sufficient to implicate potential liability under the UCL in
21 Wershba v. Apple Computer, Inc., 91 Cal. App. 4th 224, 241-44
22 (2001).

23     ICD argues that the choice-of-law clause contained in its
24 distribution agreement with Dreyer's enables it to bring a UCL
25 claim for out-of-state conduct.  That clause provides that the
26 distributor agreement "will be governed by and construed in
27 accordance with the laws of the State of California without regard

17

to any contrary conflicts of law principles." ICD's RJN, Ex. B at B-33.[4] This provision, however, addresses under what law the parties' agreement shall be construed. It does not, as relevant here, provide for the extra-territorial application of the UCL.

This defect aside, ICD has not altered its pleading to suggest that it is seeking restitution for its UCL claim and not damages. According to its current opposition, ICD believes it is entitled to restitution of monies spent to purchase Dreyer's ice cream products and distribution equipment. ICD, however, does not plead this entitlement in its 2AC. Further, ICD does not allege how purported fraudulent statements about ICD, not about the products or equipment, justify an award of restitution under the UCL. <u>Shersher v. Superior Court</u>, 154 Cal. App. 4th 1491 (2007), is inapposite and does not support ICD's position. There, the plaintiff alleged that he purchased a product based on deceptive advertising and sought restitution for the amount he paid. <u>Id.</u> at 1494. Here, ICD does not allege that it paid any monies to Dreyer's because of unlawful, unfair or fraudulent business practices. Thus, although it claims that it is seeking restitution, ICD in fact requests damages -- apparently as measured by the monies paid to Dreyer's -- for its UCL claim.

Accordingly, for the reasons stated herein and in the Court's Order of May 28, ICD's UCL claim is dismissed.

---

[4] ICD requests judicial notice of the distributor agreement it entered into with Dreyer's. Because Dreyer's does not oppose request and the content of the document is not subject to reasonable dispute, the Court grants ICD's request. Fed. R. Evid. 201.

CONCLUSION

For the foregoing reasons, the Court GRANTS Dreyer's motion to dismiss. (Docket No. 47.) Because ICD had an opportunity to amend its complaint and did not cure the defects identified by the Court, its claims against the Dreyer's entities are dismissed with prejudice. Hearns v. San Bernardino Police Dep't, 530 F.3d 1124, 1130-31 (9th Cir. 2008). Further, because the conclusions above apply with equal force to ICD's claims against Stathers, the Court also dismisses the claims against him with prejudice. See Abagninin v. AMVAC Chem. Corp., 545 F.3d 733, 743 (9th Cir. 2008).

The Clerk shall enter judgment and close the file. Dreyer's shall recover costs from ICD.

IT IS SO ORDERED.

Dated: September 10, 2010

CLAUDIA WILKEN
United States District Judge

19